# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| EMILIANO VELASQUEZ, | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. PWG-16-1807 |
| WEXFORD HEALTH SOURCES, INC., | * | |
| Defendant | * | |

## MEMORANDUM OPINION

Defendant Wexford Health Sources, Inc. ("Wexford") moves to dismiss Plaintiff Emiliano Velasquez's civil rights complaint or, in the alternative, moves for summary judgment. ECF No. 11. Plaintiff opposes the motion, ECF No. 20, and Wexford has filed a reply, ECF No. 21. No hearing is required. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons stated below, Defendant's motion is granted in part and denied in part; Plaintiff's Motions for Appointment of Counsel, ECF Nos. 22 and 23, is granted, and his Motion for Leave to File a Surreply, ECF No. 26, is denied.

## Background

Plaintiff Emiliano Velasquez, an inmate confined at Roxbury Correctional Institution ("RCI"), alleges that his Eighth Amendment rights were violated when he was not properly treated for his medical conditions. Compl. 8, ECF No. 1; Supp. 3, ECF No. 8. He complains that the treatment he received was inadequate with regard to a condition in his right eye known as Ptyergium;[1] the facial paralysis he experienced; and the pain he had in his back, leg, hip, and shoulder.[2]

---

[1] Ptyergium or "surfer's eye" is "a growth of pink, fleshy tissue on the conjunctiva, the clear tissue that lines [the] eyelids and covers [the] eyeball. It usually forms on the side closest to [the] nose and grows toward the pupil

### *Eye condition and facial paralysis*

Velasquez claims that, with regard to his Ptyergium, he was "denied all medical services," including surgery to remove the growth, even though it was causing migraine headaches and severe blurred vision. Compl. 9. He acknowledges that he received an "eye patch" on December 17, 2013; was seen, but not treated, for this condition by medical staff on January 21, 2014 and January 29, 2014; and was seen on June 19, 2015. *Id.* at 11-14. On June 19, 2015, he was informed by "[t]wo different unqualified medical staff" that "nothing was wrong" with him, and he "was issued a pair of eyeglasses," but he "could only see out of one side" of the glasses. *Id.* at 11.

Wexford has submitted verified medical records that establish that he was seen by nurses, optometrists, and ophthalmologists with regard to his right eye on March 5, 2013, March 8, 2013, June 26, 2013, December 30, 2013, January 29, 2014, February 20, 2014, February 28, 2014, March 24, 2014 (twice), May 16, 2014, June 13, 2014, July 19, 2014, August 25, 2014, May 24, 2015, June 19, 2015, July 6, 2015, August 13, 2015, August 25, 2015, September 17, 2015, October 14, 2015. October 22, 2015, December 14, 2015, February 11, 2016, February 22, 2016, April 6, 2016, April 11, 2016, June 22, 2016, and June 29, 2016. Med. Recs. Part 1, at 3, 24, 32, 34, 36, 38, 40, 42, 44, 45, 46, 49, 50, 52, 53, 58, 63, 68, 71, 73, 74, 76, 77, 82–83, 84, 85, 86, 88, 90, ECF No. 11-2. He was prescribed artificial tears, Naphcon A, sunglasses, tinted glasses, and reading glasses; referred to an ophthalmologist on more than one occasion; and

---

area. . . . In extreme cases, it can cover [the] pupil and cause vision problems." http://www.webmd.com/eye-health/pterygium-surfers-eye#1.

[2] Plaintiff states unequivocally in his Opposition that "[p]hysical areas of concern included (1) his eye/face condition, and (2) documented leg, back and hip pain[.]" Pl.'s Opp'n 1. But, given that the exhibits he attached address his shoulder treatment, out of an abundance of caution, I will consider his Eighth Amendment claim on this ground as well.

referred to internal medicine for a possible CT scan of the brain and a neurological evaluation. *Id*. at 5, 65–66, 72, 73, 77, 82–83, 84.

Velasquez also claims that, on December 13, 2013, he awoke with one-half of his face paralyzed. Compl. 12. He alleges that Officer Reel called the medical unit on his behalf, but the nurse, without examining Velasquez, advised that he "would be fine in 7 days." *Id*. He claims that he was refused treatment on December 15, 18, 20, 23, and 26, 2013 and "advised . . . to write, voicing complaints." *Id.* at 12–13.

The Medical Records show that Velasquez was seen on December 15, 2013, at which time he was advised to take 600 mg of Ibuprofen, rest, and return if his symptoms worsened. Med. Recs. Part 1, at 17. At that visit, his eyes were examined and it was noted that his right eye did not blink as much as the left; the schlera was red; and he stated the vision in that eye was blurry. *Id.* He was prescribed an eye patch on December 17, 2013. *Id.* at 20. On December 20, 2013, Sarah Starr, RN, noted that Velasquez's right eye was red. *Id.* at 21. When Velasquez was seen on December 23, 2013, he was not wearing the prescribed eye-patch, but he stated that he wore it most of the time and that he used the antibiotic ointment prescribed for his eye. *Id*. at 23. It was noted that the redness to Velasquez's right eye had improved with no drainage noted. *Id*. Four oval eye pads were provided. *Id*.

He also was seen on December 17, 2013, when he complained of right-sided facial numbness, "loudness" in right ear; headache; and difficulty eating. *Id.* at 20. Emily Failes, RN noted that Velasquez's face was drooping on the right side, his gait was normal, speech was impaired, but "grips and push pulls [were] strong and equal." *Id*. Failes consulted with the onsite provider who prescribed no work and feed-in for five days as well as an eye patch,

antibiotic ointment, a Medrol[3] dose pack, and for Velasquez to return in three days. *Id*. At the December 20, 2013 visit, Velasquez presented with an unsymmetrical smile and an inability to raise his right eyebrow, but had "sensation on both sides of his face." Med. Recs. Part 1, at 21. He had equal bilateral grip strength and his gait was normal. *Id*. He was scheduled to have his facial droop evaluated on December 23, 2013, at which time he reported that the pain in the right side of his neck to his right temple continued. *Id*. at 21, 23.

Velasquez was seen on January 22, 2014 by Dr. Morgan, who noted that his right eye closed, but not as tightly as the left, and there was still weakness on the right side of his face. Med. Recs. Part 1, at 27. Morgan prescribed a Medrol dose pack and a one-month follow-up to evaluate the residual effects of his condition. *Id*. An administrative note dated May 16, 2014 states that Velasquez had been seen by an offsite neurologist for "7th nerve" palsy[4] and the recommendation was to encourage Velasquez to perform facial exercises and to prescribe Neurontin 300 mg at bed time for his pain. *Id.* at 36.

*Shoulder pain*

Velasquez claims that Dr. Chouday saw him on July 7, 2015 regarding his shoulder and stated that he would put in a consultation request for his shoulder, but the request was not made properly. Compl. 15. In a September 13, 2015 Informal Inmate Complaint Form, ECF No. 20-1, at 2, Velasquez similarly claimed that he was referred to Dr. Manning for the consultation, but Dr. Manning had been told that the consultation was only for his back, not his shoulder, such that

---

[3] A Medrol dose pack is methylprednisone, a steroid that prevents the release of substances in the body that cause inflammation. It is used to treat many different inflammatory conditions and conditions that affect the skin, eyes, lungs, stomach, nervous system, or blood cells. *See* https://www.drugs.com/mtm/medrol-dosepak.html.

[4] Bell's palsy is a condition where the muscles on one side of the face become weak or paralyzed causing it to droop or become stiff on that side. It is caused by some kind of trauma to the seventh cranial nerve, also known as the facial nerve. Although anyone can develop the condition, it is more likely to occur in people who have diabetes or are recovering from a viral infection. Most of the time the symptoms are temporary. *See* http://www.webmd.com/brain/understanding-bells-palsy-basics.

he could not address Velasquez's shoulder pain. Admin. Compls. 2, ECF No. 20-1. In response to that complaint, Velasquez was told on September 17, 2015 to discuss his shoulder pain with the provider at his next chronic care visit. *Id.*

The record of Velasquez's medical appointments on July 7, 2015 is not in the record. Nor is it clear from the record when Velasquez next had a chronic care appointment. I note, however, that Velasquez was seen by Crystal Jamison, PA on November 18, 2015, and he reported experiencing "constant discomfort" with greater pain in his left shoulder and that his medication was not controlling the pain. Med. Recs. Part 2, at 56. Jamison noted that the x-rays of Velasquez's shoulders were unremarkable, that Velasquez agreed to try conservative pain management measures (i.e., oral medications), and that, if those did not work, he was "willing to try Kenalog injections." *Id*. Velasquez later was seen by PA Jamison on June 29, 2016 for complaints of bilateral shoulder pain, at which time he reported that the pain medication he was receiving was not controlling the pain and again expressed a willingness to try Kenalog injections. Med. Recs. Part 1, at 63. Jamison made referrals to a physician to address Velasquez's shoulder pain. *Id*. at 63–64.

### *Back condition and leg and hip pain*

On December 9, 2013, Velasquez sustained a "major back injury." Compl. 10. He claims that Dr. Morgan told him that nothing was wrong with him and at, at times his pain medication was not available to him and he had to pay for sick call visits. *Id*.

The verified medical records that Wexford provided establish that Velasquez was seen for joint pain on May 7, 2013 and October 5, 2013; and leg pain on May 22, 2013, June 27, 2013 (twice), July 8, 2013, and February 24, 2014. Med. Recs. Part 2, at 2, 5, 7, 9, 11, 12, 17, ECF No. 11-3. He began complaining of back pain on November 26, 2013, and was seen for this

problem repeatedly by nurses, physician's assistants, a neurologist, and an orthopedic doctor, between November 26, 2013, and September 30, 2015. *Id.* at 15–52. He was prescribed various pain medications and x-rays were ordered. *Id.* at 19–20, 24, 27, 34–35, 38–39, 40–41, 44. The medical providers noted tenderness of his spine, pain when moving, "[p]aravertebral muscle spasm," [5] spondylosis at L5 with "grade 1 anterolisthesis of L5 over S1,"[6] and diagnosed him with sciatica. *Id.* at 21, 23, 27, 36–37.

On April 4, 2014, Dr. Lawrence Manning, an orthopedic doctor, saw Velasquez for his back pain. Velasquez claims that this visit was also for his hip pain and that Dr. Manning recommended physical therapy and ordered an MRI for his hip. Compl. 12, 14. But, a review of the medical records clarifies that Dr. Manning saw Velasquez for his back and related pain, which included pain in his right hip. Med. Recs. Part 2, at 23. Dr. Manning recommended physical therapy for his back and stated that Velasquez should be re-evaluated after physical therapy and, if his symptoms did not improve, an MRI of the lumbar spine could be appropriate at that time. *Id.* at 23.

Velasquez claims that he had not received physical therapy as of April 26, 2014, although he concedes that he ultimately did receive three physical therapy sessions. Compl. 12. He alleges that his right hip got worse with "cracking" and "popping" that resulted in severe pain. *Id*. at 14. Velasquez was seen for complaints of hip pain on June 19, 2014 and July 19, 2014; as of June 19, 2014, he was being prescribed Ibuprofen and had a diagnosis of osteoarthritis. Med. Recs. Part 2, at 25; Med. Recs. Part 1, at 38.

---

[5]  Paravertebral muscles are muscles that are beside or adjacent to the spinal column. *See* http://c.merriam-webster.com/medlineplus/paravertebral.

[6]  Anterolisthesis is basically another term for spondylolisthesis and refers to a spine condition in which the upper vertebral body, the drum-shaped area in front of each vertebrae, slips forward onto the vertebra below. *See* https://www.spine-health.com/glossary/anterolisthesis.

On June 25, 2014, during a chronic care visit, Velasquez was seen by Dr. Purcell Bailey, who noted that he rated his back pain an 8 on a scale of 10; had not been receiving his medications; and had received three physical therapy sessions. *Id*. at 29. Bailey referred Velasquez back to Dr. Manning for re-evaluation. *Id*. at 29–30.

Velasquez received an MRI on June 3, 2015. *Id*. at 50. It showed degenerative discs at L4-L5 and L5-S1, as well as a bilateral pars defect[7] at L5; "very slight anterolisthesis of L5 on S1;" and some spinal stenosis (narrowing of the spinal canal) at L4-L5 with disc herniation at that level. *Id*. On September 30, 2015, PA Richard Sampong saw Velasquez, reviewed the MRI report and put in a request for Velasquez to be evaluated and treated by a neurosurgeon. *Id*. at 52.

After PA Sampong's request for Velasquez's evaluation and treatment by a neurosurgeon, Velasquez continued to be seen by various care providers, but did not see a neurosurgeon. Med. Recs. Part 2, at 54–66. On October 2, 2015, Velasquez reported again that he had not received his pain medication. *Id*. at 54. On November 18, 2015, PA Jamison noted that the neurosurgery consultation had been approved the month before but that Velasquez had not been scheduled for an appointment. *Id*. at 56. Jamison notified scheduling of the issue. *Id*. On March 22, 2016, when Velasquez was seen by a doctor, the neurosurgery consultation was still pending. *Id*. at 56, 61. It was noted that he had been sent to University of Maryland twice, once in October of 2015 and once the previous week, but was returned without the examination taking place because he did not have the CD of his MRI images with him. *Id*. at 61. The records do not indicate that Velasquez received the consultation with the neurosurgeon after two failed

---

[7] A pars defect of the lumbar spine involves a part of a vertebra called the pars interarticularis (meaning the part between two joints) and refers to a break in that portion of bone that leads to a separation of the upper, front portion of the vertebra from its lower, back portion. It is a precursor to spondylolisthesis. *See* http://livehealthy.chron.com/pars-defect-lumbar-spine-1040.html.

attempts when a copy of his MRI was not sent with him on the trip to see a neurosurgeon at the University of Maryland. *See* Med. Recs. Part 1 and 2.

On April 26, 2016, Velasquez was brought to the medical unit on a stretcher by correctional officers who reported that he could not stand up or walk. Med. Recs. Part 2, at 64. Velasquez was intoxicated and complained of back pain. *Id*. He eventually could reposition himself, but with pain. *Id.*

### *Supplement*

In his Supplement to the Complaint, Velasquez adds a claim against Dr. Tessema, who saw Velasquez on June 9, 2016, for a chronic care visit. Supp. 1. Velasquez alleges that he attempted to explain the issues regarding his health, but Tessema responded that he would only be seen for chronic care issues and any other issue would have to be addressed through sick call. *Id*. at 1–2. Velasquez explained to Tessema that the issues he wanted to discuss were related to his chronic care issues, that he had been waiting for over 90 days to receive treatment, and that his prescribed back pain medication was repeatedly not renewed. *Id*. at 2. Specifically, he claims that he told Dr. Tessema that he had been "waiting and seeking care under 'chronic care' for issues concerning his shoulders, and a lump on his testicles," but "doctors, and staff have refused to evaluate or treat Plaintiff for the problems." Supp. 2. He also claims that he told Dr. Tessema that his "[b]ack pain medication has repeatedly not been renewed." *Id.*

Velasquez also adds a claim that Dr. Getachew violated his rights under the Eighth and Fourteenth Amendments when he disregarded another doctor's orders. Supp. 3. Specifically, he claims that Dr. Getachew ordered physical therapy and denied the request for x-ray or CAT scan, even though on July 19, 2016, Velasquez had been sent to the University of Maryland, where a neurologist recommended an x-ray and CAT scan. *Id.* at 2–3. Velasquez filed a request for an

administrative remedy regarding this issue, and it was dismissed on the ground that the neurologist's assessment "showed no acute intervention was required but a follow up was recommended," and physical therapy and x-rays were recommended on August 1, 2016. ECF No. 20-1, at 18. According to the administrative remedy dismissal, the "X-rays were completed 8/4/16," and although four physical therapy sessions were scheduled, Velasquez failed to show for two sessions, and one make-up session was scheduled, such that he received physical therapy. *Id.* Neither the neurologist's order nor the medical records pertaining to the x-ray appear in the record.

## **Pending Non-Dispositive Motions**

Velasquez filed two Motions to Appoint Counsel (ECF Nos. 22 and 23) stating that he required an interpreter for his criminal case and now relies upon the assistance of another inmate to prepare pleadings for him in this case. This language barrier has made it difficult for Velasquez to investigate his claims. *Id*. A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is a discretionary one, and may be considered where an indigent claimant presents exceptional circumstances. *See Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975); *see also Branch v. Cole*, 686 F.2d 264, 266 (5th Cir. 1982). Upon careful consideration of the motions and previous filings by Velasquez, together with the merits of the claims asserted, the Court finds that there are exceptional circumstances warranting the appointment of an attorney to represent plaintiff under § 1915(e)(1) as more fully set forth below.

Velasquez also filed a Motion to File a Surreply. ECF No. 26. Unless otherwise ordered, a surreply is not permitted. *See* Loc. R. 105.2(a). A surreply is permitted when the opposing party raises an issue in its reply for the first time, such that the moving party would be unable to contest the matter without filing a surreply. *See Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61

9

(D.D.C. 2001). Defendant has not raised any issue for the first time in its Reply; therefore, the Motion to File a Surreply is denied.

## Standards of Review

### *Motion to Dismiss*

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id*. (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). In this regard, the Court bears in mind the requirements of Fed. R. Civ. P. 8, Bell *Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678-79. *See Velencia,* 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

### *Summary Judgment*

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or

other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.*

## Analysis

### *Eighth Amendment Claims*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

11

*Grayson v. Peed*, 195 F.3d 692, 695-96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000). Under this standard, Velasquez must present evidence sufficient to create a genuine issue of material fact as to whether Wexford was deliberately indifferent to any of his medical needs.

*Eye condition and facial paralysis*

Velasquez's claims regarding the condition of his eye and his facial paralysis do not survive scrutiny under this standard. The verified medical records, which Velasquez does not dispute, establish that he was provided treatment for the eye condition, albeit not the surgery he believes is required. Indeed, he was seen repeatedly and frequently, and prescribed medications and glasses. There is no evidence that surgical removal of the growth on Velasquez's eye has been recommended or ordered by a physician qualified to determine its necessity. As for the paralysis, Velasquez was evaluated and monitored on an ongoing basis, given medicine and an eye patch, and told to rest. There is no indication that this course of treatment was inadequate. Velasquez's complaints about his treatment for these conditions amount to a disagreement with the care provided and, given the undisputed evidence, he cannot establish a constitutional claim. Summary judgment is granted in Wexford's favor on these claims.

*Shoulder pain*

Velasquez cannot prevail on his Eighth Amendment claim regarding treatment of his shoulder pain, because the undisputed verified medical records establish that treatment for his shoulder pain is ongoing, adequate and consistent with the recommendations of the doctors he has seen. Moreover, it is consistent with the course of case to which Velasquez agreed in his November 18, 2015 appointment with PA Jamison. Med. Recs. Part 2, at 56; Med. Recs. Part 1, at 63. Examination of his shoulders also revealed that functioning of the joint was not impaired. Velasquez's assertion that he requires a consultation for his shoulders is a disagreement with the care provided, and does not state a constitutional claim. Therefore, summary judgment is granted.

*Back condition and leg and hip pain*

Velasquez's claims concerning his back and the chronic pain it causes is supported by the verified medical records; he has a serious medical condition that has been acknowledged by medical providers. Despite that acknowledgment, however, there is no evidence that Velasquez has been evaluated by a neurosurgeon as recommended and approved by providers who have reviewed the MRI images taken of his lumbar spine. It appears from the record before me that the lack of evaluation by a neurosurgeon to determine whether he would benefit from surgery would qualify as a denial of care that providers have already acknowledged is appropriate. Additionally, based on the medical records submitted, the pain caused by the condition is not addressed by the pain medications provided, the regularity of the medications' availability is disputed, and conservative treatment with physical therapy failed. On the record currently before this Court, a genuine issue of material fact exists with regard to whether the medical providers were deliberately indifferent to Velasquez's medical needs for his back condition, and this claim survives summary judgment.[8]

Wexford argues that, "[i]f the Court should determine that the claim both states a claim under Rule 12(b)(6) and survives summary judgment under Rule 56, then any surviving claim could only be construed as a claim for medical injury," and as such would be dismissed

---

[8] Wexford also argues that, even though it is a private corporation and not a government entity, it is entitled to summary judgment because qualified immunity shields it from liability. It cites *Filarsky v. Delia*, 132 S. Ct. 1657, 1667-68 (2012), by way of analogy to support its claim that, as an agent of state public officials who are entitled to assert qualified immunity, it also is entitled to assert immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Summary judgment should be denied on a qualified immunity claim if (1) there is sufficient evidence to establish a genuine issue of material fact on whether the government official violated one of the plaintiff's federally protected rights; and (2) the right at issue was "clearly established" at the time of the events in question. *See id.* at 232. Because the evidence is sufficient to establish a genuine issue of material fact on whether Wexford was deliberately indifferent to Velasquez's medical needs for his back condition, Wexford is not shielded from liability by qualified immunity, even if I were to assume (without deciding) that it could assert this defense. *See id.*

for lack of subject matter jurisdiction because Velasquez failed to comply with the Maryland Healthcare Malpractice Claims Act, Md. Code Ann., Cts. & Jud. Proc. § 3-2A-01, *et seq.* Def.'s Mem. 11 n.5. Wexford presented the same argument in *Johnson v. Wexford Health Sources, Inc*, where this Court observed

> Medical malpractice claims must first be presented to the Maryland HCADRO before a complaint may be filed in a court of law. *See* Md. Code Ann., Cts. & Jud. Proc. § 3–2A–04 *et seq.* . . . However, the mere possibility that plaintiff could also assert a claim of medical malpractice does not negate the existence of his viable claim under the Eighth Amendment.

No. JKB-14-2513, 2015 WL 3441958, at *3 (D. Md. May 26, 2015). As in *Johnson*, "[d]ismissal of plaintiff's claim pursuant to this argument of defendant[] is, therefore, denied." *See id.*

As for any pain in his hips and legs that is unrelated to his back pain, however, the undisputed verified medical records establish that, like the treatment for his shoulder, the treatment for this pain is ongoing, adequate and consistent with the recommendations of the doctors he has seen. And, insofar as Velasquez alleges that his doctor ordered an MRI of his hip, the medical records show that the MRI was not ordered for his hip, but rather for his back. Therefore, it clearly was not a failure to provide needed care when he was not given an MRI that was not ordered. Velasquez's assertion that he requires imaging studies of his hip is a disagreement with the care provided, or simply a misunderstanding that the MRI was ordered for his back, and does not state a constitutional claim.

### *Proper Defendants*

Notwithstanding the merits of Velasquez's claim regarding his back, the only served Defendant, Wexford Health Sources, is not the appropriate party. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355

F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). A private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Md. Dep't of Pub. Safety & Corr. Servs.,* 316 F. App'x 279, 282 (4th Cir. 2009). To the extent that Velasquez seeks to hold Wexford liable based on supervisor liability, he fails to identify in his pleadings a Wexford policy or procedure that proximately caused a violation of his rights. *See Monnell v. N.Y. City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). His vague and unsubstantiated attempt to do so in his Opposition is both too little and too late to state a claim. *See Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-3193, 2015 WL 2227928, at *7 (D. Md. May 11, 2015) (noting that an opposition to a dispositive motion is not a vehicle for amending a pleading). Accordingly, the claims against Wexford are dismissed. *See Love-Lane*, 355 F.3d at 782.

As for the two Defendants whom Velasquez names in his Supplement, Dr. Tessema and Dr. Getachew, Wexford argues that Velasquez should not be granted leave to supplement under Rule 15(d) to bring claims against them because the additional allegations fail to state a claim and therefore are futile. *See* Def.'s Mem. 11.

> A supplemental pleading differs from an amended pleading because it relates to matters occurring subsequent to the filing of the initial complaint. Fed.R.Civ.P. 15(d). To the extent that the Second Amended Complaint responds to the Permit Reissuance Decision, it constituted a supplemental pleading. This distinction is of little practical significance, however, because the standards used by a district court in ruling on a motion to amend or on a motion to supplement are nearly identical. In either situation, leave should be freely granted, and should be denied only where "good reason exists . . . ."

*Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002) (citation omitted). Denial is proper if the supplement would be futile, such as if it "fails to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat. Gaming Inc.*, 637 F .3d 462, 471 (4th Cir. 2011).

With regard to Dr. Tessema, Velasquez sufficiently alleges that he informed Dr. Tessema at a chronic care visit that he had chronic care needs regarding his shoulder, testicles, and back and clarified that they were, indeed, chronic issues, and Dr. Tessema deliberately refused to treat him for those issues. Specifically, he claims that he told Dr. Tessema that he had been "waiting and seeking care under 'chronic care' for issues concerning his shoulders, and a lump on his testicles," but "doctors, and staff have refused to evaluate or treat Plaintiff for the problems." Supp. 2. He also claims that he told Dr. Tessema that his "[b]ack pain medication has repeatedly not been renewed." "[P]rison doctors violate the Eighth Amendment if they . . . fail to adequately address a prisoner's complaints that the care he is receiving is not effective." *Pronin v. Johnson*, 628 F. App'x 160, 163–64 (4th Cir. 2015) (citing *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986)). Taking these pleadings in the light most favorable to Velasquez, *see Aziz v. Alcolac*, 658 F.3d 388, 390 (4th Cir. 2011), he has stated a claim of deliberate indifference in violation of the Eighth Amendment against Dr. Tessema based on Dr. Tessema's alleged refusal to address his complaints regarding his ongoing care. As for Dr. Getachew, Velasquez sufficiently alleges that the doctor ignored a specialist's order for an x-ray or a CAT scan, electing only to provide physical therapy. Although the response to the administrative remedy request suggests otherwise, it is not sufficient to warrant dismissal without a review of the relevant medical records or an affidavit or testimony as to their contents, as Dr. Getachew may provide once he is served.

Dr. Tessema and Dr. Getachew, will be served with the Complaint and the Supplement, as well as this Memorandum Opinion and Order identifying the remaining claims. Velasquez's appointed counsel will be provided an opportunity to further amend the complaint to include other parties involved in the delay of actual treatment for Velasquez's back condition following an initial discovery of all relevant medical records.

*Fourteenth Amendment Claim*

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies *as are available* are exhausted." 42 U.S.C. § 1997e(a) (emphasis added). This does not mean that administrative remedies must *be available* for all grievances; it simply means that if an administrative remedy *is available*, the prisoner must exhaust it. *See id.*

Velasquez asserts that his administrative remedy complaints were improperly handled by correctional staff and improperly dismissed by the Inmate Grievance Office for lack of jurisdiction. In this regard, he has not stated a constitutional claim. Exhaustion of administrative remedies with regard to claims against medical staff—the proper defendants in this case—is not required by the PLRA and does not hinder Velasquez's right of access to the courts. Moreover, Wexford and its employees do not have the authority to direct how the Maryland Division of Correction addresses administrative remedy complaints. Further, "given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *See Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472, 493 (1995) (requiring an atypical and

18

significant hardship as prerequisite to creation of a constitutionally protected liberty interest). This claim is dismissed.

The following chart shows the claims that remain and the claims that have been dismissed:

| *Remaining claims* | *Dismissed claims* |
|---|---|
| Eighth Amendment<br>- claim against Dr. Tessema (regarding treatment of shoulder and back pain and testicular lump)<br>- claim against Dr. Getachew (regarding treatment of back condition)<br>- other defendants may be identified for claim regarding treatment of back condition as discovery proceeds | Eighth Amendment<br>- all claims against Wexford (regarding treatment of eye condition and facial paralysis; back condition; and shoulder, leg, and hip pain) |
|  | Fourteenth Amendment claim in its entirety |

A separate Order, granting in part and denying in part Defendant's motion, denying Velasquez's Motion to File a Surreply and granting Velasquez's Motions for Appointment of Counsel, follows.

September 19, 2017　　　　　　　　　_____/S/_____
Date　　　　　　　　　　　　　　　Paul W. Grimm
　　　　　　　　　　　　　　　　　United States District Judge